# United States Court of Appeals

## For the First Circuit

No. 02-2358

UGURHAN AKTURK KOSEREIS,

Plaintiff, Appellant,

v.

STATE OF RHODE ISLAND, DEPARTMENT FOR CHILDREN,
YOUTH & FAMILIES, RHODE ISLAND TRAINING SCHOOL, ET AL.

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Mary M. Lisi, U.S. District Judge]

Before

Torruella, Circuit Judge,

Bownes, Senior Circuit Judge,

and Lynch, Circuit Judge.

Richard J. Savage for appellant.
Rebecca Tedford Partington, Deputy Chief, and Patrick Lynch,
Attorney General, Office of the Attorney General, for appellees.

June 12, 2003

**BOWNES, <u>Senior Circuit Judge</u>.** Plaintiff-appellant, Ugurhan Akturk Kosereis ("Kosereis"), brought a discrimination claim in the district court against his employer, the State of Rhode Island Department of Children Youth and Families, Rhode Island Training School ("the Training School"), and the director of the Training School in his official capacity. Kosereis alleged that the defendants discriminated against him based on his religion and national origin in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, and various state laws. The district court granted the defendants' motion for summary judgment because Kosereis failed to produce sufficient evidence that he suffered from discrimination. Although the district court's decision contained legal errors, we affirm.

## I.    BACKGROUND

When reviewing a district court's grant of summary judgment, we state the facts in the light most favorable to the opposing party and draw all reasonable inferences in his favor. <u>See</u> <u>Sands</u> v. <u>Ridefilm Corp.</u>, 212 F.3d 657, 661 (1st Cir. 2000). Kosereis is a Turkish-born Muslim who works as a vocational teacher at the Training School. The Training School is a juvenile correction facility that contains both classrooms and residences. Kosereis has worked for the Training School since 1975. During his tenure, he has taught woodworking, autobody, and at the times relevant to this appeal, welding and auto mechanics.

-2-

Kosereis has experienced difficulties with tardiness and absenteeism. In 1981, the Training School issued Kosereis a reminder about taking excessive sick leave without proper documentation. The problem became worse in the mid-1990s when Arlene Chorney ("Chorney") was hired as principal of the Training School. According to Kosereis, his discriminatory treatment "started the day Dr. Chorney became principal."

Chorney instituted a new work schedule that, in Kosereis' words, was "very complicated." Kosereis claims that the complexity of the work schedule caused him to become confused about when he was required to report for work. In 1995, for example, disciplinary proceedings were initiated against Kosereis because he missed work without notifying the proper personnel. In 1996, Kosereis was verbally disciplined for being late to a class. In 1997, Kosereis was given a written reprimand for failing to report to his first period class. In 1998, Kosereis received a disciplinary letter for falsifying his time records. This reprimand, however, was later expunged from his record. In 1999, Kosereis was verbally reprimanded after he failed to report for work in the morning.

It is clear that Chorney made efforts to clarify the work schedule. As part of the verbal reprimand in 1996, Chorney explained the schedule to Kosereis in the presence of his union representative. In Kosereis' 1997 letter, Chorney again offered

Kosereis help:

> As a professional, you are expected to arrive to school and classes on time.  You are also expected to follow your schedule.  If you are unable to understand your schedule, I will assist you further.

In addition to the alleged complicated work schedule, Kosereis claims that Chorney was responsible for a host of other problems. He says that Chorney did not give him sufficient funding, adequate supplies or proper facilities to teach auto mechanics.  Kosereis was required to work in a particular building that he says lacked ventilation and was dirty.  Chorney denied Kosereis' request for a sabbatical to travel to Turkey and study that country's juvenile justice system.  Instead, Kosereis was granted a sabbatical to take courses in Rhode Island.  Kosereis also says that Chorney did not do enough to stop students from calling him "turkey" and teachers teasing him about his Turkish food in the lunchroom.

In 1995, Kosereis was laid off and soon after initiated an administrative appeal with the Rhode Island Commissioner of Education ("the Commissioner").  While the appeal was pending, Kosereis filed a claim with the Rhode Island Commission for Human Rights ("RICHR") and the Equal Employment Opportunity Commission ("EEOC") alleging that his job was terminated because of discrimination.  The EEOC ultimately issued Kosereis a right to sue letter, but the RICHR did not.

In 1996, Kosereis' administrative appeal of his lay-off was decided.  The Commissioner determined that Kosereis was laid off

-4-

for "good and just cause," but nevertheless reinstated him with backpay because he did not receive a timely notice of his lay-off.

Two years after Kosereis returned to work, he filed another set of claims with the RICHR and the EEOC. This time, he alleged that Chorney's disciplinary actions stemming from his absenteeism constituted discrimination. Kosereis claimed he was disciplined in retaliation for filing his earlier claims of discrimination. Both the RICHR and the EEOC issued right to sue letters.

Having properly navigated the administrative waters of the RICHR and the EEOC, Kosereis filed a complaint in the district court. He alleged that the defendants violated Title VII by creating a hostile work environment and denying him equal terms and conditions of employment because of his religion and national origin. Kosereis then amended his complaint and added the allegation of retaliation. Kosereis also raised claims under the Rhode Island Civil Rights Act, R.I. Gen. Laws § 42-112-1 (1998), and the Rhode Island Fair Employment Practices Act, R.I. Gen. Laws § 28-5-1 (2000).

After discovery, the defendants moved for summary judgment. The district court referred the case to a Magistrate Judge who recommended that the defendants' motion be granted. The district court adopted the Magistrate Judge's recommendation and granted summary judgment in favor of the defendants on both the federal and state law claims. Kosereis filed a timely appeal, but challenged

only the district court's rulings regarding the federal law claims. It is to these rulings we now turn.

**II. DISCUSSION**

We review a district court's grant of summary judgment <u>de novo</u>. <u>See</u> <u>Muniz Cortes</u> v. <u>Intermedics, Inc.</u>, 229 F.3d 12, 14 (1st Cir. 2000). Summary judgment for the defendants is appropriate when the evidence is so one-sided that no reasonable person could find in favor of the plaintiff. <u>See</u> <u>Kearney</u> v. <u>Town of Wareham</u>, 316 F.3d 18, 22 (1st Cir. 2002). There are four issues we must address in this appeal: whether Kosereis was precluded from litigating issues pertaining to his lay-off; whether Kosereis was treated differently than other co-workers because of his religion and national origin; whether Kosereis suffered from a hostile work environment; and whether Kosereis was subjected to discriminatory retaliation.

A. <u>Preclusion</u>

Our initial inquiry is whether Kosereis can, as part of this case, delve into matters related to his 1995 lay-off. The lay-off is important to Kosereis in this litigation because he believes it helps establish that he was subjected to disparate treatment, a topic which we will discuss later.

The district court held that the doctrine of res judicata barred Kosereis from litigating any issues related to his lay-off. "Under federal law, the doctrine of res judicata dictates that a

final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." Perez v. Volvo Car Corp., 247 F.3d 303, 311 (1st Cir. 2001) (quoting Allen v. McCurry, 449 U.S. 90, 94 (1980)). The district court reasoned that Kosereis' administrative appeal of the lay-off, and the Commissioner's subsequent ruling that he was laid off for "good and just cause," amounted to a final judgment on the merits for purposes of res judicata. This ruling was incorrect.

The critical part of the district court's ruling stated that "[t]he doctrine of res judicata applies to a decision of a quasi-judicial administrative tribunal," such as the decision by the Commissioner in the present case. To support this statement, the district court cited to Department of Corrections of State of Rhode Island v. Tucker, 657 A.2d 546, 549 (R.I. 1995), in which the Rhode Island Supreme Court held that Rhode Island state courts give preclusive effect to quasi-judicial administrative tribunals.

The district court was correct in looking to state law for answers to questions regarding the preclusive effect of state administrative decisions. Federal common law generally requires that federal courts accord the decisions of state administrative agencies acting in a judicial capacity "the same preclusive effect to which it would be entitled in the State's courts." Univ. of Tenn. v. Elliott, 478 U.S. 788, 799 (1986). But that is not the

-7-

end of the matter. Even if state courts apply res judicata to state administrative decisions, federal courts will only follow suit if doing so is consistent with Congress' intent in enacting the federal statute at issue. See Astoria Fed. Sav. and Loan Ass'n v. Solimino, 501 U.S. 104, 110 (1991) (citing Elliot, 478 U.S. at 796). This means that when the preclusive effect of a state administrative decision is in question, the central inquiry is one of federal statutory interpretation. See Thomas v. Contoocook Valley Sch. Dist., 150 F.3d 31, 38 (1st Cir. 1998). In this case, the district court erred by looking no further than the predilections of the state court; the district court failed to consider the vital question of congressional intent.

That said, we need not canvass the congressional intent underlying Title VII. The Supreme Court has already considered the matter, and held that Congress did not intend that unreviewed state administrative decisions would prohibit plaintiffs from bringing subsequent Title VII actions in federal courts. See Elliot, 478 U.S. at 795-96. We will, of course, follow the Supreme Court's ruling in Elliot. The administrative decision issued by the Commissioner regarding Kosereis' lay-off was not reviewed by a court. It therefore does not have a preclusive effect on Kosereis' Title VII claims. See Thomas, 150 F.3d at 39 ("It is now settled, however, that State agency findings that are not reviewed by a state court are not entitled to any preclusive effect in a

-8-

subsequent action under Title VII") (emphasis in original). Kosereis is free to use the facts related to his lay-off as evidence of disparate treatment. The district court's holding to the contrary is overruled.

B.   Disparate Treatment

Kosereis claims that he was denied equal terms and conditions of employment because of his religion and national origin. Kosereis concedes, however, that he lacks direct evidence of discrimination. This means that the case turns on whether Kosereis has presented sufficient circumstantial evidence of discrimination. See Weston-Smith v. Cooley Dickinson Hosp., Inc., 282 F.3d 60, 64 (1st Cir. 2002). To make this determination, we use the burden-shifting analysis from McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 33 (1st Cir. 2001).

Under the McDonnell Douglas analysis, a plaintiff must establish a prima facie case, which in turn gives rise to an inference of discrimination. See Dichner v. Liberty Travel, 141 F.3d 24, 29-30 (1st Cir. 1998). The employer then must state a legitimate, nondiscriminatory reason for its decision. See Zapata-Matos v. Reckitt & Colman, Inc., 277 F.3d 40, 44 (1st Cir. 2002). If the employer can state such a reason, the inference of discrimination disappears and the plaintiff is required to show that the employer's stated reason is a pretext for discrimination.

See id. at 45.

Generally, a plaintiff establishes a prima facie case by showing that (1) he is a member of a protected class; (2) he was qualified for the job; (3) the employer took an adverse employment action against him; and (4) the position remained open or was filled by a person with similar qualifications. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993); Santiago-Ramos v. Centential P.R. Wireless Corp., 217 F.3d 46, 54 (1st Cir. 2000).

The district court assumed, arguendo, that Kosereis made out a prima facie case. In doing so, it quoted language in Rivera-Rodriguez v. Frito Lay Snacks Caribbean, 265 F.3d 15 (1st Cir. 2001), and described the fourth prong as requiring plaintiff to show that "other similarly situated employees who were not members of the protected class were treated more favorably." Id. at 25. This language was dicta, however; the plaintiff's prima facie case was not contested as part of that appeal. Nor did the case that Rivera-Rodriguez cited, Mulero-Rodriguez v. Ponte, Inc., 98 F.3d 670, 673 (1st Cir. 1996), involve the prima facie showing required for disparate treatment claims. Dicta, of course, is not binding on future panels. See Municipality of San Juan v. Rullan, 318 F.3d 26, 28 n.3 (1st Cir. 2003).

In Conward v. Cambridge School Committee, 171 F.3d 12 (1st Cir. 1999), in contrast, we explicitly rejected the notion that plaintiffs in disparate treatment cases are required to demonstrate

-10-

that they were treated differently as part of their prima facie case.[1]  Rather, we held that:

> [T]he time to consider comparative evidence in a disparate treatment case is at the third step of the burden-shifting ritual, when the need arises to test the pretextuality vel non of the employer's articulated reason for having acted adversely to the plaintiff's interests.

Id. at 19.  We have since repeated our Conward ruling.  See Fernandes, 199 F.3d at 584 ("[A] plaintiff need not show as part of his prima facie case that the employer either recalled similarly situated non-minority employees or otherwise treated employees of different ethnic backgrounds more favorably.").

Our holding in Conward makes sense and is attuned to the applicable law.  We have described the prima facie case as a "small showing," Reed v. LePage Bakeries, Inc., 244 F.3d 254, 259 (1st. Cir. 2001), that is "not onerous," Santiago-Ramos, 217 F.3d at 54, and is "easily made," Gillen v. Fallon Ambulance Serv., Inc., 283 F.3d 11, 30 (1st Cir. 2002).  The pretext analysis, on the other hand, is more demanding.  See Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 255 (1981) (stating that the pretext analysis moves the inquiry "to a new level of specificity").  Thus, Conward presents the applicable rule:  in disparate treatment

---

[1]    It is a different issue if a plaintiff opts to provide comparative data as part of a prima facie case.  See, e.g., Fernandes v. Costa Bros. Masonry, Inc., 199 F.3d 572, 585-86 (1st Cir. 1999).  Our question here is whether a comparative analysis is required as part of a prima facie case.

cases, comparative evidence is to be treated as part of the pretext analysis, and not as part of the plaintiff's prima facie case. 171 F.3d at 19.

As in Conward, the district court here went on to grant summary judgment because there was insufficient evidence of pretext. We agree that Kosereis failed to present adequate evidence of pretext to survive summary judgment, and affirm on that basis.

The "ultimate touchstone" of the McDonnell Douglas analysis is whether the employer's actions were improperly motivated by discrimination. Fite v. Digital Equip. Corp., 232 F.3d 3, 7 (1st Cir. 2000). Evidence that the employer's stated reasons for its actions are pretextual can be sufficient to show improper motive, and hence, allow the plaintiff to survive summary judgment. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000); Fite, 232 F.3d at 7; Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 6-7 (1st Cir. 2000).

Plaintiffs can show that an employer's stated reasons are pretextual in any number of ways. See Santiago-Ramos, 217 F.3d at 55. One method is to produce evidence that the plaintiff was treated differently than other similarly situated employees. See Straughn, 250 F.3d at 43-44; Fernandes, 199 F.3d at 581. To show disparate treatment, Kosereis relies heavily on the claim that only he was disciplined for failing to come to work on time. He says

that other tardy employees were never disciplined.

The record, however, does not support Kosereis' claims. There is simply no evidence that other teachers who failed to report to work were not disciplined. In fact, the evidence is just the opposite. Chorney testified at her deposition that she had issued written or verbal reprimands to employees other than Kosereis for being late to work.

Kosereis raises a number of other instances of disparate treatment. All of these are insufficient to show pretext because they do not involve facts or circumstances similar to those Kosereis faced. To successfully allege disparate treatment, a plaintiff must show "that others similarly situated to him in all relevant respects were treated differently by the employer." Conward, 171 F.3d at 20; see also Rosado v. Radio Shack, Inc., 312 F.3d 532, 534 (1st Cir. 2002) (stating that to have a plausible differential treatment claim, plaintiffs must show that others similarly situated were treated differently). The examples of disparate treatment "need not be perfect replicas, [but] they must closely resemble one another in respect to relevant facts and circumstances." Conward, 171 F.3d at 20.

Kosereis claims that a secretary and some teachers were not disciplined after they returned late to work after going out to lunch for "Secretary's Day." Kosereis admitted at his deposition, however, that he did not know whether the secretary and the

teachers violated any rules. Kosereis did not know, for example, whether they had permission to return late or whether they used personal time for the lunch. He also did not say whether the teachers' late arrival caused them to miss classes, as was the case in his situation.

In the same vein, Kosereis claims that other teachers who behaved inappropriately were never disciplined. He cites an instance where a student's fingers were cut by a machine in a carpentry class. Chorney testified in her deposition that the teacher in charge of the carpentry class was not punished because the student had been told not to touch the machine, but disobeyed the teacher's order. Kosereis cites an instance where a staff member urinated outside the school. Chorney explained that the staff member was not punished because the incident did not take place on school property or on school time. Chorney also lacked personal knowledge of the incident. Kosereis says that a staff member once used profane language in Kosereis' classroom. Chorney explained that she did not discipline the staff member because she was not the staff member's supervisor, but she did forward a report of the incident to the appropriate person. In short, the long lunch for "Secretary's Day," the accident in the carpentry class, the alleged urination, and the use of profanity are not sufficiently similar to the facts and circumstances surrounding Kosereis' discipline to give rise to a finding of pretext.

Kosereis also points to examples of disparate treatment outside the context of disciplinary matters. Kosereis claims that he was required to work in a particular building that was dirty and lacked ventilation. Kosereis, however, admitted at his deposition that other teachers were required to work in the same building.

Kosereis claims that he was not permitted to take a sabbatical in Turkey to study that country's juvenile justice system. He has presented no evidence, however, that other teachers were treated more favorably by being permitted to take sabbaticals overseas. Moreover, Kosereis was granted a sabbatical, albeit to take courses in Rhode Island.

Kosereis says that other vocational teachers, such as the carpentry and culinary arts teachers, were given equipment and their own classrooms. Specifically, Kosereis complains that he was not given a shop in which to teach auto mechanics and was not permitted to use an automobile in his class. The record demonstrates, however, that the auto mechanics program was not unique in this regard. Chorney testified at her deposition that the health vocational program, like the auto mechanics program, does not have its own equipment or a special classroom.

Moreover, the Training School was without an auto mechanics shop well before the alleged discrimination took place. Chorney explained that there has not been an auto mechanics shop at the Training School since at least 1989 because of budgetary

-15-

constraints. She also said that Kosereis' proposal to bring an automobile to school as a teaching aid was rejected for safety and security reasons. Chorney was concerned that there was no place inside the school to store the automobile, and that it would remain outside and unsecured.

Kosereis alleges that in 1995 the Training School announced that three other teachers, in addition to Kosereis, were to be laid off, but only Kosereis' job was actually eliminated. Chorney explained at her deposition that the other teachers were not laid off because they resigned after learning of the lay-offs. Their jobs were not filled and the positions were eliminated. There is no evidence that Kosereis was treated differently than the teachers who resigned.

There is one piece of evidence, however, that merits careful analysis. In 1998, Kosereis received a written reprimand from Chorney for falsifying his time records. Kosereis informed Chorney that he was not working on the alleged date of the falsification. Chorney then amended the written reprimand with new dates. Kosereis contested the reprimand and it was ultimately expunged from his record. Chorney maintains that she simply made a mistake as to the dates. Kosereis says this evidence shows that Chorney's disciplinary measures were pretextual. We do not think this one incident, standing alone, is enough to permit a reasonable jury to find that the defendants' explanation for Kosereis' discipline was

pretextual. This is especially true in light of Kosereis' numerous other instances of absenteeism and tardiness -- none of which he contests. See Reeves, 530 U.S. at 148 (stating that summary judgment may be appropriate "if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred."). Rather, Chorney's changing of the dates creates only a "slight suggestion of pretext," which we have held is insufficient to survive summary judgment. Zapata-Matos, 277 F.3d at 47 (citing Reeves, 530 U.S. at 148).

To summarize, all of the instances of disparate treatment cited by Kosereis, save the one involving the expunged reprimand, are either unsupported by the record or are distinguishable in important respects from the facts and circumstances that Kosereis faced. See Straughn, 250 F.3d at 43-44. We have been "particularly cautious" about affirming an employer's motion for summary judgment on a discrimination claim when the case boils down to whether the employer's stated reasons are pretextual. Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 167 (1st Cir. 1998) (citation omitted). But the evidence that Kosereis presents regarding pretext is so weak that we have no difficulty affirming the district court's grant of summary judgment as to the disparate treatment claim. See Zapata-Matos, 277 F.3d at 47-48.

C.   Hostile Work Environment

A hostile work environment exists in violation of Title VII "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  See Harris v. Forklist Sys., Inc., 510 U.S. 17, 21 (1993) (citations and quotation marks omitted).  There is no "mathematically precise test" to determine whether Kosereis presented sufficient evidence that he was subjected to a hostile work environment.  Id.  Rather, we look to all the circumstances, including the frequency and severity of the discriminatory conduct, whether it was physically threatening or humiliating, and whether it unreasonably interfered with Kosereis' work performance.  See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116 (2002); Gorski v. N.H. Dep't of Corr., 290 F.3d 466, 472 (1st Cir. 2002).

Kosereis claims that he was subjected to a hostile work environment when the residents of the Training School called him "turkey," when fellow teachers teased him in the lunchroom about his food, and when Chorney issued him repeated reprimands for his absenteeism.  Mindful that "[t]he accumulated effect of incidents" can amount to a hostile work environment over time, we consider Kosereis' evidence collectively.  O'Rourke v. City of Providence, 235 F.3d 713, 729 (1st Cir. 2001).

-18-

The name calling by the residents of the Training School and the teasing by the teachers in the lunchroom do not rise to the level of "severe or pervasive conduct," that is required for a hostile work environment claim. Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 754 (1998). A hostile work environment generally is not created by a "mere offensive utterance," Harris, 510 U.S. at 23; nor does it arise from "simple teasing, offhand comments, and isolated incidents." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998). Courts are supposed to use "[c]ommon sense, and an appropriate sensitivity to social context," to distinguish between such innocuous behavior and severely hostile or abusive conduct. Oncale v. Sundowner Offshore Serv., Inc., 523 U.S. 75, 82 (1998).

Here, Kosereis, an adult, was called names by children who reside at a juvenile correction facility. When Kosereis complained to Chorney about the name calling, she met with the children and other staff members on two separate occasions to resolve the problem. As for the teasing by fellow teachers about Kosereis' food, there is no evidence in the record that this teasing was frequent or severe. It also bears mentioning that Kosereis has not produced any evidence that the comments about which he complains, either those made by the children or those made by his colleagues, were physically threatening or interfered with his work performance.

-19-

There is even less merit to Kosereis' claim that he suffered a hostile work environment because of Chorney's repeated reprimands. The reprimands were frequent only because Kosereis continued to miss work. If Kosereis wished for the reprimands to stop, then he could have simply arrived at work on time. The name calling by the children, the alleged teasing by the teachers, and Chorney's reprimands did not create a hostile work environment. See, e.g., DeNovellis v. Shalala, 124 F.3d 298, 311 (1st Cir. 1997). The district court's grant of summary judgment on Kosereis' hostile work environment claim is affirmed.

D.    Retaliation

To maintain a claim of discriminatory retaliation, a plaintiff must produce evidence that (1) he engaged in protected conduct under Title VII; (2) he experienced an adverse employment action; and (3) a casual connection exists between the protected conduct and the adverse action. See Gu v. Boston Police Dep't, 312 F.3d 6, 14 (1st Cir. 2002). The parties dispute only the final prong of the analysis, and our discussion is limited accordingly.

Kosereis says that Chorney's reprimands and her denial of his sabbatical to Turkey constituted retaliation for filing his claims of discrimination with the RICHR and the EEOC. After carefully examining the record, we can find no evidence that a casual connection exists between the denial of the sabbatical and Kosereis' charges of discrimination. In fact, Kosereis was

permitted to take a sabbatical in Rhode Island.

Nor is there any evidence connecting Kosereis' reprimands to the discrimination charges he filed with the RICHR and the EEOC in 1996. "It is insufficient for [Kosereis] to simply recount that he complained and that he was disciplined . . . ." King v. Town of Hanover, 116 F.3d 965, 968 (1st Cir. 1997). In fact, the warning letter Kosereis received in 1981 and the disciplinary proceedings that were initiated against him in 1995 demonstrate that Kosereis had been disciplined for instances of absenteeism well before the alleged discrimination took place. The district court's grant of summary judgment on Kosereis' retaliation claim is affirmed.

## III. CONCLUSION

After reviewing the record in the light most favorable to Kosereis, we conclude that he has failed to produce evidence that he was treated differently than fellow co-workers because of his religion or national origin, was subjected to a hostile work environment, or suffered discriminatory retaliation. The district court's grant of summary judgment in favor of the defendants is **AFFIRMED.** No costs are awarded on appeal. So ordered.