# United States Court of Appeals
## For the First Circuit

No. 17-1792

LARA CARLSON,

Plaintiff, Appellant,

v.

UNIVERSITY OF NEW ENGLAND,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Jon D. Levy, U.S. District Judge]

Before

Torruella, Lynch, and Barron,
Circuit Judges.

Alexis Garmey Chardon, with whom Christopher A. Harmon, David
Kreisler, and Terry Garmey & Associates were on brief, for
appellant.
Peter F. Herzog, with whom Patricia A. Peard, Amber R.
Attalla, and Bernstein Shur were on brief, for appellee.

August 10, 2018

**LYNCH**, **Circuit Judge**.  The district court entered summary judgment against Dr. Lara Carlson, a faculty member, on her claim of retaliation under Title VII and the Maine Human Rights Act (MHRA) against her employer, the University of New England (UNE).  Carlson alleges that, after she complained to UNE about sexual harassment by her department chair and supervisor, Dr. Paul Visich, the school retaliated against her in various ways.  These alleged retaliatory acts include transferring her to a new department after obtaining her consent to transfer based on material misrepresentations.  She alleges that this transfer reduced her teaching and career opportunities.

Carlson has demonstrated that there are genuine disputes of material fact as to whether UNE misled Carlson into transferring departments.  There is also a genuine dispute of fact as to whether Carlson's transfer was the true reason for her change in course assignments.  We reverse the district court's entry of judgment and remand for further proceedings.

## I. Background

A.  Facts

"We recite the relevant facts in the light most favorable to [Carlson]."  Collazo v. Nicholson, 535 F.3d 41, 43 (1st Cir. 2008).  Carlson joined UNE as a tenure-track assistant professor

in the Exercise and Sport Performance (ESP) Department in 2009.[1] She was hired to teach "courses that support the Applied Exercise Science and Athletic Training curricula, such as exercise physiology, applied exercise nutrition, and other courses as determined by the Chair." Starting in 2009, Carlson began teaching Exercise Physiology. In 2012, Carlson developed and began teaching a course called Environmental Physiology. She taught Exercise Physiology and Environmental Physiology until 2015.

In the fall of 2011, Dr. Paul Visich joined UNE as the Chair of the ESP department, making him Carlson's direct supervisor and the chair of her tenure committee. Throughout that same fall, Visich touched Carlson on her knee, thigh, and hand during one-on-one office conversations. Visich would stare at Carlson's chest during these conversations. During this same period, Visich also made inappropriate, sexually charged comments to Carlson via email and in person. We need not go into further detail about the

---

[1] During her time at UNE, Carlson states that she has received a great deal of recognition for excellence in her field. She has been nominated for UNE's Westbrook College of Health Professions' Distinguished Teaching award. She has received UNE's Excellence in Academic Advising Award. She has won many grants to fund her research. She has served on several national associations and committees in the field of exercise physiology. One of these committees is the New England Chapter of the American College of Sports and Medicine (NEACSM). Carlson was nominated and elected to serve two terms as the President of NEACSM. Under Carlson's mentorship, her students have received the NEACSM Undergraduate Research Experience Grant on multiple occasions. Students under her mentorship have twice received UNE's Outstanding Research/Scholar Award.

comments. UNE admitted to Carlson that the messages were sexual harassment. We take that as a given.

Carlson was afraid to report Visich's behavior because he was her supervisor. As Carlson's supervisor, Visich was responsible for evaluating her performance for tenure and merit raise purposes. Carlson eventually complained to Timothy Ford, Dean of UNE's Westbrook College of Health Professions (WCHP), about Visich's behavior in the fall of 2012. Dean Ford told her to meet with Sharen Beaulieu, UNE's Director of Human Resources. Carlson met with Beaulieu on September 28, 2012 and brought hard copies of the inappropriate emails to the meeting. Beaulieu said, during that meeting, that the emails were sexual harassment.

After this meeting, Visich had a conversation with Carlson in which he brought up a comment that Carlson had made to Beaulieu. This led Carlson to believe that Visich had been told about her discussion with Beaulieu. Carlson met with Beaulieu and Dean Ford again in October 2012. Beaulieu and Dean Ford agreed that "Dr. Visich's behavior constituted 'sexual harassment.'" Beaulieu and Dean Ford nonetheless recommended that Carlson meet with Visich. Carlson declined. Beaulieu reiterated this recommendation in a November 7, 2012 meeting. Carlson did not want to meet with Visich but she "was not given an alternative."

Carlson, as she had been instructed, met with Visich, with Beaulieu present, on November 20, 2012. At that meeting,

- 4 -

Beaulieu said the meeting was Visich's idea. Beaulieu then said that "Paul and I can address [Visich's emails] but we need to figure out that even when I address that, he is your chair so we've got to figure out a way to make this work." This led Carlson to believe that Visich would remain her supervisor "no matter what." Beaulieu recommended that Carlson meet with Visich more and instructed her to "be open" and "give [Visich] a chance."

After the meeting, Visich both remained Carlson's direct supervisor and the chair of her tenure committee. Visich wrote a negative performance evaluation of Carlson in early June. Carlson first received a copy of the evaluation by interoffice mail on June 18, 2013. Carlson wrote a rebuttal and submitted it the next day. When Carlson confirmed the receipt of her rebuttal with the Dean's assistant, she learned that Visich had submitted his evaluation of her on June 19, 2013 (the day after she first received it) "along with a cover letter that [Carlson] had never seen, claiming [inaccurately] that [she] had failed to sign and return [her] evaluation" to Visich.

The Physical Therapy Reappointment Promotion and Tenure Committee, after reviewing Visich's evaluation and Carlson's rebuttal, determined that Carlson's performance "far exceed[ed]" the evaluation that Visich provided. Carlson requested that UNE remove Visich as the chair overseeing Carlson's application for

tenure.    UNE  agreed.    Visich,  however,  remained  her  direct supervisor.

On September 5, 2013, before any decision on Carlson's tenure was made, Visich walked up behind Carlson while she was speaking with a student in a university parking lot and "rubbed [her] shoulder and upper back in an unwelcomed manner."  Carlson reported the incident to Beaulieu, who investigated the incident. Beaulieu reviewed the statement of the student who witnessed the interaction, in which the student described Visich's behavior as "[c]reepy" and said that he "found it weird that [Visich] was so touchy with [Carlson]."  The student stated that "Prof. Visich has a reputation among students of being creepy around women." Beaulieu also reviewed the statement of one of Visich's subordinates, who was present for the incident and who asserted: "I was not listening at the time nor was I paying close attention to [Visich and Carlson].  I do not recall Paul touching Lara at any point during this interaction."  Beaulieu concluded that no sexual harassment had occurred.

Dean Ford left UNE in 2013.  In July of 2013, Elizabeth Francis-Connolly replaced Dean Ford as Dean of WCHP, making her Visich's supervisor.  She said later that she was not told about Carlson's prior complaints about Visich's behavior.  Nor was she told that some of Visich's prior complained-of behavior had been deemed sexual harassment by UNE.

- 6 -

In October 2013, Visich caused Carlson to be removed as the head of UNE's College Bowl team.[2] Carlson had founded the team in 2009 and successfully led it up to that point. Visich stated that Carlson was removed because the department wanted to change the student selection process, but he did not change the selection process after removing Carlson.

Later in the fall of 2013, Visich made the procedure for allowing non-ESP-major students to apply to Carlson's Environmental Physiology course more strict. This led to four out of the five non-ESP-major applicants (who needed a waiver of the prerequisite requirement) being denied enrollment in the course.

In January 2014, Carlson met with Beaulieu and Dean Francis-Connolly to request that she no longer have to report to Visich. She requested a surrogate supervisor. Dean Francis-Connolly refused, saying, "I've seen that before and it doesn't work." Dean Francis-Connolly stated that Carlson "would have to be removed from the department" if she wanted a new supervisor. Carlson did not want to leave the department, but she considered it because of Dean Francis-Connolly's statement that it was the only way to avoid working under Visich, who continued to harass her.

---

[2] Carlson describes College Bowl as "a jeopardy-like competition in the field of exercise science and sports medicine in which teams from schools in [UNE's conference] compete against one-another."

During this meeting, Carlson told Dean Francis-Connolly that she would agree to a transfer, but she did so only on the condition, expressed to the Dean, that she "get to keep [her] classes and continue to do [her] job." Carlson emailed Dean Francis-Connolly on February 18 saying that she appreciated Dean Francis-Connolly's "consideration of moving [her] to another Department" and that a transfer "could resolve the situation" for her if it "can be accomplished along the lines [they] discussed." On March 11, 2014, Dean Francis-Connolly emailed Carlson to tell her that she was looking into transferring Carlson to the College of Arts and Sciences. She also said that, in the meantime, Carlson would be reporting to her. This was an about face from her earlier statement to Carlson that Carlson could not be moved from under Visich's supervision.

Later that spring, Visich removed the dedicated laboratory time allocated for Carlson's Exercise Physiology class. Visich explained that move by saying that, after he spoke with the department directors, they had determined that "almost all of the current lab topics" covered in Carlson's lab "are being taught in other classes or could easily be added to an existing course." He also said that this practice would "result in fairly good savings to the college." Carlson was not notified of this proposed change until after Visich had discussed it with Dean Francis-Connolly, who expressed support for Visich's decision. In fall 2014,

Visich's subordinate asked Carlson to perform different labs than the ones she was conducting. Left with only classroom instruction and "without the equipment necessary," Carlson was unable to conduct the requested labs.

Carlson had been awarded tenure by her tenure committee in March 2014. For the academic year 2014-2015, Carlson continued to teach Exercise Physiology, although her lab time had been removed. Visich had recommended that Dean Francis-Connolly assign someone else to teach that course. Dean Francis-Connolly stated she rejected this recommendation because "it was still a transition period."

In spring of 2015, Dean Francis-Connolly removed Carlson from teaching upper level Exercise Physiology and Environmental Physiology courses in the ESP Department for the 2015-2016 academic year. In doing so, she adopted Visich's recommendation. Carlson was not told about this change. Rather, she found out about this change when she read the published course catalog, which listed the instructor for Exercise Physiology and Environmental Physiology as "TBD."

Dean Francis-Connolly instructed Carlson instead to teach two courses that Carlson felt were "remedial" general education courses.[3] Dean Francis-Connolly told Carlson that there

---

[3] Dean Francis-Connolly asked Carlson to teach Research Methods (ATC 420) and Methods of Scholarly Inquiry (IHS 210) during

were two reasons for her decision: (1) "faculty are expected to teach [a broad set of courses]" and (2) Francis-Connolly felt she needed "to create distance" between Visich and Carlson.  When Carlson replied that she did not understand why this meant she could not continue to teach Exercise Physiology and Environmental Physiology in the ESP Department, Francis-Connolly stated that Carlson was "not full-time in the department."

Later that year, Carlson requested that Dean Francis-Connolly cross-list Environmental Physiology in the Biology Department so that Carlson could teach it.  Dean Francis-Connolly initially accepted the proposal, but Visich convinced her to change her mind and reject it.[4]  Visich taught Environmental Physiology in Carlson's stead.  In 2015, UNE hired a new visiting professor, who was tasked with teaching Exercise Physiology.

In July 2014, Carlson was removed from her position as an advisor to students in the ESP department.  Visich also had Carlson's profile removed from the ESP department's website.

---

this meeting.  Research Methods was in the ESP Department.  Methods of Scholarly Inquiry appears to have been in a different department, but the record does not say which.  Carlson taught two sections of Methods of Scholarly Inquiry in 2015-2016.  The materials for that course, including the syllabus, examinations, homework, and PowerPoint slides, were pre-written.

[4]     Visich stated he was not notified ahead of time and that his "only" concern was that Carlson "wanted to change the prerequisites" so that freshmen and sophomores could take the course, which Visich felt was inappropriate because "environmental physiology is an upper level course."

External funders had found Carlson through the course website before her removal. She was not contacted by external funders after her profile was removed from the ESP Department website.

UNE provides merit raises to faculty based on their yearly evaluations, and Carlson received a 2% raise for academic year 2016, which is the smallest raise she has received as a percentage of her salary while at UNE.

Carlson became a member of UNE's Department of Physical Therapy in July 2016. Carlson's lack of expertise in Physical Therapy prevents her from "teaching any courses in physical therapy." The Physical Therapy Department handbook requires that a faculty member must be a licensed physical therapist in order to participate in certain department decisions. As a result, Carlson cannot "participate in many department changes . . . including curriculum changes."

Carlson filed a complaint of retaliation with the Maine Human Rights Commission (MHRC) and the Equal Opportunity Commission (EEOC) on or about November 4, 2014. Carlson filed this lawsuit in state court on January 4, 2016 alleging retaliation in violation of the MHRA and Title VII, and UNE removed the case to federal court on February 16, 2016.

B.    District Court Proceedings

On summary judgment, the district court found that three of the alleged adverse actions were time-barred because they had

occurred more than 300 days before her EEOC and MHRC complaints: (1) Visich's negative performance evaluation of Carlson for the 2012-2013 year, (2) Carlson's removal as head of the College Bowl team, and (3) the curriculum committee's refusal to grant prerequisite exemptions to certain students who wished to take Carlson's Environmental Physiology course.

The district court then held that, since Carlson stated that her transfer out of the ESP Department was voluntary, the transfer could not qualify as an adverse action to support a retaliation claim. The district court also found that, although Carlson's change in course assignments, removal from the website, and removal as an advisor to ESP Department students could be adverse actions, each was caused by her voluntary transfer out of the ESP Department and could not have been caused by her protected behavior. The district court also found that, even if Carlson had shown a causal connection, UNE had met its burden of providing a non-retaliatory reason for these actions by arguing that they were attributable to Carlson's voluntary transfer to a new department.

## II. Discussion

A.  Standard of Review

This court reviews grants of summary judgment de novo. Town of Westport v. Monsanto Co., 877 F.3d 58, 64 (1st Cir. 2017). Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in her favor. See Billings v. Town of Grafton, 515 F.3d 39, 41 (1st Cir. 2008). The credibility of Carlson's testimony is not to be evaluated at the summary judgment stage. See Town of Westport, 877 F.3d at 66 (quoting Pina v. Children's Place, 740 F.3d 785, 802 (1st Cir. 2014)).

B.    Legal Framework

Title VII prohibits employers from retaliating against employees who report violations of that title. 42 U.S.C. § 2000e-3(a). The parties agree that the same standard should apply to Carlson's Title VII and MHRA retaliation claims. See Osher v. Univ. of Me. Sys., 703 F. Supp.2d 51, 64 n.12 (D. Me. 2010); see also Carnicella v. Mercy Hosp., 168 A.3d 768, 774 (Me.), cert. denied, 138 S. Ct. 1170 (2018) ("Because the MHRA generally tracks federal anti-discrimination statutes, it is appropriate to look to federal precedent for guidance in interpreting the MHRA.").

An employer's retaliatory act must amount to an adverse action in order to give rise to a retaliation claim. See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006). An adverse action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 68. (internal quotation marks omitted)

- 13 -

(quoting Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). This objective standard requires that the retaliation suffered is more serious than "petty slights or minor annoyances."  Id.

Where, as here, a plaintiff attempts to prove a retaliation claim based on circumstantial evidence, courts apply the burden-shifting scheme established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See Che v. Mass. Bay Transp. Auth., 342 F.3d 31, 38 (1st Cir. 2003).  First, the plaintiff must make a prima facie showing.  This means an employee "must show: (1) she engaged in protected conduct; (2) she suffered an adverse employment action; and (3) that a 'causal nexus exists between the protected [conduct] and the adverse action.'"  Garayalde-Rijos v. Municipality of Carolina, 747 F.3d 15, 24 (1st Cir. 2014) (alteration in original) (quoting Ponte v. Steelcase Inc., 741 F.3d 310, 321 (1st Cir. 2014)).  The parties agree that Carlson engaged in protected activity by reporting Visich's alleged harassment to UNE.

If the plaintiff makes a prima facie showing of retaliation, the burden shifts to the defendant to "articulate a legitimate, non-discriminatory reason for the challenged actions." Billings, 515 F.3d at 55.  "If the employer's evidence creates a genuine issue of fact, the presumption of discrimination drops from the case, and the plaintiff retains the ultimate burden of showing that the employer's stated reason for [the challenged

- 14 -

actions] was in fact a pretext for retaliating . . . ." Id.
(alteration in original) (quoting Colburn v. Parker
Hannifin/Nichols Portland Div., 429 F.3d 325, 336 (1st Cir. 2005)).

C.   Transfer

"[A] transfer is adverse if it materially changes the
plaintiff's conditions of employment in a manner that is 'more
disruptive than a mere inconvenience or an alteration of job
responsibilities.'" Caraballo-Caraballo v. Corr. Admin., 892 F.3d
53, 61 (1st Cir. 2018) (quoting Burns v. Johnson, 829 F.3d 1, 10
(1st Cir. 2016)).

As the district court acknowledged, Carlson's transfer
to a new department led to a change in her teaching assignments,
her removal from the ESP Department website, and her removal as an
advisor to ESP Department students.  A jury could find that the
"disparity in duties" between her role while a member of the ESP
Department and her role after her transfer "makes the transfer an
adverse employment action."  Id.

The district court held that the transfer was voluntary
and so, in its view, the transfer could not be an adverse action.
That reasoning overlooked one of the theories Carlson put forward
at the summary judgment stage.  Carlson argues that Dean Francis-
Connolly led her to transfer out of the ESP Department by making
misrepresentations about how the transfer would affect her

professional responsibilities.[5]  Specifically, Carlson alleges that Dean Francis-Connolly promised that, if Carlson were to transfer to a new department, she could continue teaching Exercise Physiology and Environmental Physiology.  Carlson further alleges that, once she was transferred, Dean Francis-Connolly assigned her to teach different courses, and that those courses were not equivalent but, in fact, were remedial-level courses that carried less responsibility than her previous courses.

Carlson stated in her deposition that she told Dean Francis-Connolly that she would transfer departments on the condition that she could "keep [her] classes and continue to do [her] job."  Carlson then followed up with Dean Francis-Connolly in an email, a copy of which is in the record, saying that she would be willing to transfer "<u>if [the transfer] can be accomplished along the lines we discussed</u>."  (emphasis added).

After Carlson left the ESP Department, Dean Francis-Connolly in fact assigned Carlson to teach different courses, and lower level ones at that.  A jury could find that Dean Francis-Connolly induced the plaintiff's consent to the transfer through false premises and that these courses required a

_____

[5]  UNE argues that Carlson waived this argument by failing to raise it below.  <u>See</u> <u>Saunders</u> v. <u>Town of Hull</u>, 874 F.3d 324, 331 (1st Cir. 2017) (citing <u>McCoy</u> v. <u>Mass. Inst. of Tech.</u>, 950 F.2d 13, 22 (1st 2017)).  We find that it was properly preserved in both her statement of facts in dispute and her brief.

lower skill level than those Carlson previously taught. A jury could find that Carlson would not have accepted the transfer but for Dean Francis-Connolly's misrepresentations. A jury could also reasonably infer that Dean Francis-Connolly did so in retaliation against Carlson. A reasonable jury could also find that these events would not have occurred "but for" Carlson's activity in reporting Visich's sexual harassment of her. Univ. of Texas Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 346 (2013). Because the record supports these inferences, Carlson has made a prima facie case sufficient to survive summary judgment.

Dean Francis-Connolly's shifting justifications for the change in Carlson's teaching responsibilities support our decision. Dean Francis-Connolly alternately told Carlson that the change was a natural result of Carlson transferring to a new department and that she wanted Carlson to teach a wider array of courses. UNE has also argued that the change was a result of Visich's view that Carlson was not communicating well with Visich. These explanations are undermined by Carlson's allegation that Dean Francis-Connolly justified her decision by saying that she wanted to create distance between Visich and Carlson.[6] A jury

---

[6] The district court, in justifying its pretext decision, pointed out that UNE's statement of material facts attributed the teaching-assignment change to the fact that Carlson "refuses to communicate with" the directors of the ESP Department. The district court then found that Carlson did not deny this allegation and so could not show that the reason was pretextual. This is a

could infer from UNE's and Dean Francis-Connolly's changing explanations and from the other evidence in the record that the statements made to Carlson to induce her consent to transfer were not accurate.

UNE has not put forward a non-retaliatory justification for why Dean Francis-Connolly would have misrepresented Carlson's ability to keep teaching Exercise Physiology and Environmental Physiology. As a result, UNE has failed to "articulate a legitimate, non-discriminatory reason for th[is] challenged action[]." Billings, 515 F.3d at 55.

D.      Salary Increases

Carlson argues that UNE retaliated against her by giving her salary raises in 2016 and 2017 that were the lowest of her career, as measured as a percentage of her salary. The district court held that Carlson could not show a dispute of fact on this issue because "the record does not . . . contain any basis for comparing those accomplishments with her accomplishments in the

---

misreading of the record. UNE's statement of material fact said that "Dr. Visich told Dean Francis-Connolly that [Carlson] 'refuses to communicate with'" the directors of the ESP department and that, as a result, he no longer had "control over this course anymore in regard to the content." This statement only goes to what Visich told Dean Francis-Connolly. It does not describe Dean Francis-Connolly's reason for following Visich's recommendation or even whether Visich's statement was true. As a result, Carlson's statement of material facts did not amount to a concession that Visich "had no control over" Environmental Physiology and Exercise Physiology.

preceding years," which made it impossible "to compare the 2016 and 2017 raises with her earlier pay raises and assess whether they constituted adverse employment actions."[7]  Carlson argues on appeal that the record contains evidence of her many accomplishments from 2015-2017 and that that is enough to show that there is a dispute of fact on this issue.

We find no error in the district court's ruling on this point.  Carlson is missing critical factual support for her argument that the size of her raises in 2016 and 2017 were adverse actions.

Carlson agrees that the size of a faculty member's annual raise is linked to the amount of funding available for faculty raises in a given year.  Carlson did not provide any information about the amount of funding available for 2016 or 2017, making the district court's analysis impossible.

Carlson also agrees that a faculty member's annual raise is typically based on her annual performance review.  In order to determine whether Carlson's raise should have been larger, the district court would need to decide whether her raise was commensurate with her accomplishments in the prior year.  This

---

[7]      The district court also asserted that "[t]he correct unit for comparing pay raises from one year to the next is . . . the dollar amount of the raise, and not the raise as a percentage of the employee's total compensation."  Carlson argues this was error.  We do not reach the issue.

comparison is impossible without a benchmark.  Carlson provided the size of her raises for the prior years she was at UNE, but did not provide sufficient information about her achievements in prior years.  Without evidence about her earlier accomplishments, the court cannot draw a comparison to prior years.  This makes it impossible to determine whether UNE was retaliating by giving her a smaller raise than she deserved in 2016 and 2017.

### III.  <u>Conclusion</u>

The district court's entry of summary judgment is <u>reversed</u> in part.  The case is <u>remanded</u> for further proceedings consistent with this opinion.  Costs are taxed against the University of New England.